It's been a long time since I've seen seven lawyers listed on the same case. Yes, your honor. I'm going to be quick because I don't have much time when I'm up here. May it please the court, my name is Carissa Oden. I represent Kimberly, Hershey, and Jeanette Negra, who were the engineer and the onboard service railroaders who were injured in this crossing collision. This case revolves around a train tractor collision at a crossing in Tangibahoa Parish called the Fluker Crossing. This is a very important case and we appreciate that the court is allowing us oral argument today because on this date in October 10th of 2018, one life ended and two drastically changed. Kimberly Hershey, as I said, is the onboard service attendant. She's the person that helps you on the train when you're riding. She was on train 59 the day of this accident. The train was moving at about 79 miles an hour, collided with a tractor trailer driven by Bobby Jenkins. When the collision occurred, the impact was so great that it slammed Kimberly in the back of one of the cars onto her knees and she was taken by ambulance from the scene of the accident. She endured a cervical surgery. She still has more treatment four years after this accident. And she'll never work on a train again. Jeanette Negger was the engineer driving the train that day. She's worked for Amtrak for 27 years. She's gone through this particular crossing for 17 of those years and she was also taken by ambulance after this accident. She lost a year of work because of it and sustained back injuries. And Bobby Jenkins unfortunately lost his life. So the issue in this case, Your Honors, is pretty simple. Our position is summary judgment as to the railroad defendants and also Heck Industries was inappropriately granted by the lower court. Lower court acted as a trier fact and left my clients without a remedy. The question, Your Honor, is are there material facts viewed in the light most favorable to Ms. Kimberly and Ms. Jeanette which allow the case to be heard by the jury? And our position is that's yes to both the railroad defendants and to Heck Industries. For the railroaders, for Ms. Jeanette and Kimberly, they're covered under FELA, which is the Federal Employer's Liability Act. They don't have state workers comp and so their remedy lies solely in that act. For FELA cases, the Supreme Court has been very clear that it's the providence of the jury to weigh the factors including the nature of the task and the hazard it entails in determining employer fault. And if it played any part, even in the slightest, the employer can be at fault. This Honorable Court in Howard v. Illinois Central ruled that the test of sufficiency of evidence in FELA cases is much like the Alabama rule which provides that even if there's a scintilla of evidence, a jury question is presented. So against the railroad, Your Honor, the first main points I'd like to make is that the dangerousness of the Fluker Crossing is a cause even in the slightest of this collision. And my mom's a history teacher. She used to tell me that and tell her students that to understand the present and why things happen in a certain way, we have to understand the past. So the history of this crossing is very important. There were four other collisions at this Fluker Crossing with injuries. Before this accident, there was one after. Again, for 17 years, Ms. Nagler went through this crossing and she encountered numerous near misses at the crossing with tractor trailers leaving this particular sand pit. All of these near misses would have been reported to the railroad on the dispatch. On the date of this accident, when she had to yell emergency into the radio, when the railroad's dispatch came on, they told her that it was a bad crossing, it had been reported numerous times, and that no one was going to do anything about this particular crossing. So the evidence in the case from her testimony, also from railroad expert Brandon Ogden, is that the Fluker Crossing is unguarded, it's unusually inherently dangerous, there's a faded stop sign there, an unreflectorized crossbook. The deputy that investigated the accident also said that these signs should have been replaced. There's no marked lines on the crossing, no gates or lights. And so, Your Honor, there's enough material facts in the case, it just should have been to the jury to decide. Let's take all those facts as true, the faded sign and those sorts of things. Generally that might be relevant, but how would that be relevant to a case like this where this particular truck driver had used that crossing numerous times repeatedly? That's a great question and part of what the railroad will argue to you. And I would say that that is another fact. The jury needs to be able to look to see the history of how often Bobby Jenkins went through that crossing. The railroad doesn't get off the hook by saying, okay, it's a dangerous crossing, we haven't done anything about it, we'll just play Russian roulette until somebody gets hurt at this crossing. So I think that is part of the facts that the jury should weigh. Along with the video, there's a locomotive camera that was on the front of the engine at the time of the accident. Judge Brown in the Eastern District, she had a similar case and said that that, including the video, should go to the jury to weigh those facts to see if there are multiple causes, not Bobby Jenkins being the sole cause of the accident. We make the same points against Heck Industries, Your Honor. So just like with the railroad, we believe that the lower court got it wrong as far as Bobby Jenkins being an independent contractor. We're arguing that he was an employee of Heck Industries. And I would point the court to their precedent in the Newcomb case. It's very analogous to what we're dealing with in this particular case where there's a bunch of factors that the court looked at and determined that while there were certain things that made that particular plaintiff possibly an independent contractor, there were others, and if there's a mixed question of fact and law, it should go to the jury. In our briefing, we provided a chart, and those same factors that were in the Newcomb case are the same against Bobby Jenkins and Heck, the same factual pieces, and those should have gone to the jury. Specifically, Your Honor, for Mr. Jenkins, there was not a discrete piece of work that he was doing, same thing in the Newcomb case. Bobby Jenkins and Heck did not have a written contract that said independent contractor. What is a discrete piece of work in the context of what he was doing? Yes, Your Honor, meaning there wasn't just one thing that was covered under a contract from a certain duration of time. He was hauling sand for them for two years exclusively, so there wasn't a contract in that case, just one thing that he was doing for them under contract. There was also, they required in . . . Let me ask you a question. You don't have much time left. I'm reading some more about it. Go ahead. You got anything to close with? No, Your Honor, other than we just believe that the lower court should be reversed and I'll save the rest of my time for rebuttal. All the rest of your time. Thank you, Your Honor. All right, thank you, Ms. Oden. Ms. Wyatt. Good afternoon, Your Honors. May it please the Court. I'm Margaret Jo Wyatt and I represent Heck Industries. I'll be speaking on behalf of Heck as appellant today. My colleague, Larry Plunkett, will be speaking on behalf of Heck as appellee and he'll address some of the arguments that Ms. Oden has made. The claims by Ms. Hershey and Ms. Nagra against Heck are the basis for Heck's cross-claim for defense and indemnity from Progressive Insurance. The 1998 Peterbilt truck you heard Ms. Oden talk about was an insured automobile on a commercial auto policy Progressive issued to Bobby Jenkins and B.J. Trucking in July 2016. Heck was named as an additional insured on this policy beginning in July 2016. Progressive issued Heck a certificate of insurance in July 2016 and began issuing additional insured endorsements. And I've asked the Court and Deputy to hand, Your Honors, a copy of the certificate of insurance and some of the additional insured endorsements that were filed as Exhibits 1 through 4 in opposition to the motion for summary judgment that the Court granted. It's this motion for summary judgment that Heck appeals and respectfully asks this Court to reverse. As you can see, the certificate of insurance expressly states on page 2, please be advised that the additional insureds and lost payees will be notified in the event of midterm cancellations. And the description of coverage on all the additional insured endorsements is the very same both before and after the conversion, and I'm using Progressive's term, the conversion from full commercial liability coverage to non-trucking. Progressive conceded in its corporate deposition that all the additional insured endorsements Progressive issued to Heck from 2016 through 2018 were worded exactly the same except for the dates. That's in the Record on Appeal at page 3728. Heck's status as an additional insured is important because Louisiana law requires an insurer to notify an additional insured before it cancels a policy, even if the cancellation is done at the request of the named insured. Now, Progressive argues at page 2 of its brief, this Court must decide whether the trial court correctly found that Progressive's conversion of the policy to a non-trucking liability policy did not constitute cancellation. Nothing could be further from the truth. The district court did not conclude that conversion of the policy from one form to another did not constitute cancellation. Instead, what the district court held is that assuming arguendo, the non-trucking endorsement constituted a cancellation, Heck was provided notice of cancellation prior to the accident. That's in the order and reasons that granted that summary judgment. It's in the Record on Appeal at page 5757. So with my limited time for argument this afternoon, the issue I'd like to address first is, was the midterm conversion of that policy on August 12, 2017, from a primary commercial liability policy to a secondary non-truck policy, was that a cancellation of that commercial liability policy? Louisiana Insurance Code section 1267 defines cancellation for purposes of this kind of policy, and it calls it cancellation of termination, so it defines the term with a synonym. The statute just exchanges one word for another, and Louisiana courts, they haven't directly spoken on this issue. Now, to be sure, Progressive didn't change the policy number, but the policy number's not the policy. The policy's the insuring agreement. And if that non-trucking conversion is valid, there's no question that the original insuring agreement, the commercial liability policy, was terminated, and it was replaced with a different insuring agreement. So last Friday, we came across a case issued by this court that offers some guidance on this issue of whether conversion is a cancellation. We'll provide a supplemental citation to the court. It's more of a state form. It involved a property insurer's conversion of some homeowners' policies from one form to another, and the conversion of these policy forms was expressly accepted from the Insurance Code's cancellation provision that was in effect at that time, which was Insurance Code section 636. Section 636 is the precursor to article, to sections 1267 of the Insurance Code. So implicit in the legislature's action... Does your argument mean that any revision to a policy is a cancellation? Cancellation of the old and institute of a new? I'm just wondering how far your argument... Well, the argument is that the policy, that the commercial liability policy, which covered Mr. Jenkins when he drove this truck to work, that was terminated, because whenever he drove this truck for work, he didn't have coverage anymore. Now, I can't tell you whether... ...cancel coverage was changed. A very significant revision. But is it a cancellation of the policy? You guys from Louisiana Law, you said they support you, but I'm not sure it flows exactly. You got... I mean, it's a very important question. It is the linchpin question for the rest of our arguments, which is why I'm addressing it first, because my time's probably going to be run out before I get to address much else. But the policy is not some number that's been assigned by the insurance company. The policy's got to be the insuring agreement. Lots of cases out there... Say there are 100 different significant matters of policy. If you change any one of them, I don't think that's a cancellation. Someone's trying to figure out when a policy is canceled just because it's not just... Very significant change here. Because it's been changed. Well, the commercial auto liability policy was terminated, to use the language from 1266. That policy was terminated. None of the coverage under that policy existed after that August 12, 2017, policy change call made by Bobby Jenkins. None of it. And so I would say that in this case, that change was a termination, and therefore under 1267 was a cancellation. And I would say that the Louisiana legislature, I believe, agrees with me because they specifically amended the statute 636 in order to allow State Farm to transform these homeowners' policies from one form to another. And that's in the Moore case, which is why I brought it to the court's attention. So if we assume, as the district court did, that this was a cancellation, the district court's conclusion that Heck got proper notice is not supported by the record. Heck testified that the insurance certificate, which was allegedly faxed to Heck in January of 2018, wasn't received. It was nowhere to be found in the file that was maintained by Heck for that type of document. Progressive testified it had some kind of an audio recording from an individual named April, who called, asked for the certificate, then confirmed receipt of the fax. But progressive's evidence is put in direct dispute by Wallace Heck's testimony. So it's clearly a disputed fact. Add to this disputed fact a very significant question of whether an insurance certificate that keeps the same policy number and then has an oblique reference to non-trucking liability can even satisfy the stringent requirements of notice of cancellation. How is that a notice of cancellation? Louisiana courts have held that notice of cancellation means the insured is actually aware of coverage that's being terminated. That's the Babcock case from the Louisiana Second Circuit from May of 2021. The Louisiana Second Circuit is hardly a bastion of anti-insurance judges. Occardo v. Clarendon, the case that we cited, says that former Section 636 entitles an additional insured to actual notice even if the named insured cancels the policy. There's no question that there is a factual dispute as to whether my client got actual notice of cancellation of that policy. And the final point I'd like to address is there's no undisputed evidence Bobby Jenkins even intended to cancel the policy or knew what non-trucking meant. And the Louisiana Supreme Court in the Louisiana Maintenance v. Lloyd's case has said exclusions are not valid unless clearly communicated to the insured. And the only evidence we'll ever have of what Bobby Jenkins understood, asked for, agreed to, is that audio recording. And in this audio recording, Bobby Jenkins asks to take the mate trailer off the policy but keep the million dollars on the truck. He asks again to be reassured. And he says, but I still got the million dollars on the truck. And the progressive representative says yes. Now that phone call is anything but positive and unambiguous proof of an understanding by Bobby Jenkins that his commercial liability insurance was going to be terminated. Or that progressive clearly communicated the non-trucking exclusion to Jenkins. So based on the record on appeal, progressive has not put forward the required uncontested facts. So what was the premium reduction for then, if he still had the coverage? The premium reduction was substantial. But in that phone call, Bobby Jenkins never talks about premium. He just talks about taking the trailer off the truck, off the coverage, and keeping the insurance on the truck. Never mentions premium. And unless the court has any other questions at this time, I'll save the rest of my time for rebuttal. Thank you, Ms. Wyatt. Thank you. Good afternoon, Your Honors. My name is Travis Bourgeois. I represent the Gray Insurance Company. I'm here before you as both appellant and appellee in this case. Gray is taking the position of appellant siding with the arguments just made by Heck. Gray's insured. So I wish to adopt those arguments. But just to explain to the court, Gray issued an excess business auto policy to Heck. And Gray was brought into this litigation not by the plaintiffs, but by B.J. Trucking, who asserted a cross-claim against Heck and a third-party demand against Gray for insurance coverage as to B.J. Trucking. Gray filed a motion for summary judgment as to B.J.'s third-party demand asking to be dismissed because there is no coverage, and that summary judgment was granted. That is our issue as appellee. But in this case, B.J. Progressive, as insurer of Mr. Jenkins and B.J. Trucking, also filed a motion for summary judgment. We opposed it as we had a cross-claim against Progressive. Progressive's motion was granted. Therefore, we filed this appeal as other parties had appealed our dismissal. Therefore, we wish to preserve the right to proceed with that cross-claim if this Court decides to reverse the rulings at issue. All of the issues are well briefed, and you have multiple briefs before you, so I really won't waste any of the Court's time. Gray adopts the position just argued by Heck in brief in an oral argument, but I just wanted to point out two additional issues that Heck really didn't have time to get into and that Gray raised in opposition to the motion for summary judgment filed by Progressive, and that is the specter of elusive coverage offered by Progressive to Mr. Jenkins and B.J. Trucking, and specifically as to Heck as an additional insured. It is undisputed that Heck is an additional insured under the Progressive policy, but we filed in opposition the affidavit, a declaration and report of Louis Fay, an insurance expert, who says there is no potential scenario whereby Heck could be provided coverage under this policy, under the non-trucking policy exclusion, because it's not going to cover another company. It's only going to cover Mr. Jenkins and B.J. while they're using the truck not in a commercial fashion. But the accident here happened while he was using the truck in a commercial fashion. Heck is listed as an additional insured. It received certificates of insurance showing that it was an additional insured, but there's the potential of no possibility of coverage if Progressive's position is correct. Therefore, we took the position that summary judgment was premature as the facts were being developed. And finally, we argued in our brief that public policy prohibits application of the trucking exclusion, and we referred the court to the Louisiana Compulsory Motor Vehicle Liability Security Law. I'm sure your honors know about that law, where Louisiana requires automobiles to obtain minimal insurance coverage for every vehicle that's on the road. The facts of this case, as it comes down, demonstrates that Mr. Jenkins, while he was driving this truck in this capacity, was uninsured. There was no insurance available to him if the exclusion urged by Progressive is applied. Instead, we argue in citing to the Sanfel, Rusden, and RPM cases out of Louisiana that what Louisiana does is strike an offending policy provision and find coverage in those instances where there is no minimum coverage provided under the policy. That is our position, and I'll cede the rest of my time. All right, thank you, Mr. Bourgeois. Representing Amtrak, you have Ms. Rooker. Good afternoon, your honors. My name is Kelly Juneau Rooker, and I'm arguing on behalf of the railroads today, Amtrak and Illinois Central. I'm sorry, you're arguing on behalf of Amtrak? The railroads, Amtrak and Illinois Central. My remarks will be limited to the appellant's FILA claims. The district court properly granted summary judgment as to the appellant's FILA claims in this case, and this court should affirm for three reasons. First, there is no FILA exception to Rule 56. Summary judgment is appropriate in FILA cases when there is no genuine issue of material fact that 100% of the fault is attributable to someone other than the railroad. And in 2020, the circuit held exactly that in Gray v. Alabama Great Southern Railroad. Two, the district court acted within its discretion in granting summary judgment prior to the close of discovery, and moreover, that issue was not preserved for appeal. And three, considering the record evidence, including the incontrovertible video evidence in this case, no reasonable jury could find anything other than that the cause of this accident was Mr. Jenkins' failure to stop, look, and listen at the crossing and to yield to an oncoming train. The facts of this case are very simple. On a clear day in October 2018, Mr. Jenkins drove directly into the path of an oncoming train without ever stopping. There were no sightline obstructions at the crossing. Mr. Jenkins disregarded a clearly identifiable stop sign and crosswalks, and he failed to heed an audible and visible oncoming train, which, by reason of speed and nearness to the crossing, presented an immediate hazard. He simply never stopped. We know this because we have video evidence that shows us exactly what happened that day. The record also establishes that Mr. Jenkins was very familiar with this crossing. As Judge Smith pointed out during my opponent's argument, he had been traversing this crossing for a number of years, and he had crossed it several times earlier that very day. Fela defendants, or rather, despite that familiarity and despite the immediate and deadly hazard of this oncoming train, Mr. Jenkins rolled slowly through this crossing without ever stopping. Now, appellants would have you believe that summary judgment is never appropriate in a Fela case, but that is incorrect. Fela defendants are entitled to summary judgment when the evidence shows that plaintiff cannot carry her burden of proof as to an essential element of her claim. In gray, this circuit expressly recognized that when the negligence of someone other than the railroad was the sole proximate cause of the accident, the railroad is entitled to summary judgment. And that's because Fela is not a workers' compensation scheme. The railroad is not strictly liable whenever an employee is injured. Fela liability only arises where the railroad failed to exercise reasonable care, and that failure was the cause of the incident in which the employee was injured. It seems to me gray, Alabama, Great Southern, there's considerably different facts in that exactly what happened wasn't clear, but nonetheless we found there was no possible contributing liability by the railroad. In this case, I guess what happened in a way is clear, but the argument from your friends on the other side is that the multiple collisions that have occurred there, I guess not always with Amtrak, but with other railroads, shows it's a hazardous crossing, which seems to be true, whatever hazardous may mean. Is there no liability by the operator of the railroad, Illinois Central, of the tracks or Amtrak, when you have, and what would create liability for the railroads who own the track or are leasing the use of the track when there are many collisions at a particular crossing? Well, first, in response to that, Judge Selfick, I would argue that there is no admissible evidence in the summary judgment record to establish that this crossing was, in fact, a dangerous crossing, as my opponent argues. Well, you don't want to label, but there is evidence, maybe not admitted, that there have been five or six other collisions here? There is inadmissible hearsay evidence put forth in an affidavit by Ms. Jonathan-Agra to that effect, yes, which we recognize. However, the Louisiana law is clear that drivers traversing railroad crossings are required to slow and stop, if necessary, at least 15 feet prior to a crossing if any of three conditions are present. All that means is that person will always have some liability for a collision. But on the field, you must have no liability yourself as a railroad. The railroad must have no liability, and that is true. I mean that personally, but you have Amtrak or Illinois Central. Yes, well, wait. The mere fact that somebody's violating the law just means they're liable to some extent. So how do we know you have no liability if, in fact, there have been several collisions at this intersection, and Illinois Central, Canadian National, Amtrak haven't done anything about it? I think what the distinction here is that it's not that the driver has some liability. It's the driver has 100% of the liability for failing to stop. Had he stopped at the crossing, this accident never would have occurred. And moreover, the railroad has no control over what happens outside of the perimeters of that rail. What you're saying is that in a crossing, the train never has responsibility for stopping or slowing. No, Your Honor, I'm not saying that, but Louisiana law is clear, and the Louisiana Supreme Court has ruled in the Lejeune case that a train crew is not responsible or is entitled, rather, to presume that a driver is going to obey the law and stop at the crossing in time to avoid an accident. And they're only required to put the train into emergency once the vehicle has fouled the tracks. In this case, Mr. Jenkins, in the video, establishes that Mr. Jenkins fouled the tracks with less than four seconds until impact. Up until that time, the train crew and Ms. Jeanette Nagra properly assumed that he was going to stop as he was required to do so by law. He didn't. When he fouled the tracks, nothing could have prevented the accident at that point, and 100% of the fault lies with Mr. Jenkins. And again, where the evidence demonstrates that someone other than the railroad, in this case, Mr. Jenkins, was the sole cause of an accident, a FELA claim cannot survive summary judgment. I'm running out of time quickly, so I'll just say that, though she didn't address it in her oral argument, the position that more discovery should have been allowed by the court prior to ruling on summary judgment fails because the plaintiffs did not raise a Rule 5016 motion at the district court level. So that argument has been... has been not preserved. Also, I would like to also... I would like to highlight to this court the Alfaro decision from 2015, which the circuit affirmed a crossing-collision case, finding that the driver's failure to stop was the sole cause of the accident. Not only has the circuit found that in Alfaro, multiple other Louisiana state courts have found that as well. And for those reasons, particularly the undisputed record evidence and the circuit rulings in Gray and Alfaro, summary judgment should be affirmed. All right. Thank you, Mr. Plunkett. Mr. Plunkett. Good afternoon, Your Honor. May it please the court, Lawrence Plunkett for Heck Industries on the issue of independent contractor versus employee status of Bobby Jenkins and B.J. Trucking. Simply stated, the district court properly found that Bobby Jenkins and B.J. Trucking were independent contractors as to Heck Industries and not Heck Industries' employee. While determination of the independent contractor status is a fact-intensive and case-by-case question where there are no facts at issue and only one conclusion can be reached, summary judgment is appropriate. There is no real dispute that the court properly applied the law in terms of independent contractor status of Mr. Jenkins and his company, B.J. Trucking. The situation here is there really is no dispute as to the facts that were presented to the district court. Now, the plaintiffs would point to two things, an overarching control issue and an exclusive working relationship situation, and I'll address those in a minute, but those are really the only two arguments that they raise. They don't dispute the facts upon which the court made its ruling. This is a situation where it is totally appropriate for summary judgment to have been granted in favor of B.J. Trucking, or against B.J. Trucking and in favor of Heck. On February 23rd, the court issued its order on independent contractor, its first order on independent contractor status where it laid out its findings in detail, and that was in connection with finding that Jenkins was not an employee for insurance coverage purposes. At that point, the judge then invited plaintiffs to make an argument as to why Heck should not be then dismissed because of the independent contractor status of Jenkins. And at that point, the show cause order was issued, and then in May of 2021, the district court reaffirmed its opinion just finding that Jenkins was an independent contractor. Thus, the district court had two separate occasions and in two separate contexts to review Jenkins and B.J. Trucking's status as an independent contractor, and both times came to the same conclusion that Jenkins was an independent contractor. The court properly applied the Hickman versus the Hickman test on control under Louisiana law and found that not only did the five-part test that Louisiana courts have used to determine independent contractor status, the facts fit into that test, but then the judge also pointed to a number of other factors that led him to conclude that Johnson was an independent contractor and not an employee. Now, this afternoon, it was suggested that there was no contract, that that in and of itself is enough to defeat the independent contractor argument, and counsel referred to the Newcomb case, which is a nearly 40-year-old case from this court, which was pre-amendments to Louisiana Code of Civil Procedure Article 966, which makes summary judgments favored rather than disfavored, but I would also address that issue of the no contract issue. The district court cited Tate, which is a 2009 Louisiana Fourth Circuit case, which specifically said that you did not have to have a written contract, that you could have an agreement. I would also point to Judge Southwick's case. Judge Southwick was involved in Kansas City Southern versus DSK, which was a similar case where there was an oral agreement as opposed to a written contract. So the failure to have a written contract is not fatal to independent contractor status. In fact, what we have is basically a series of day-to-day contracts where Bobby Jenkins accepts on a daily basis an assignment to haul sand or other materials for a predetermined price. It's not based on a salary. It's not based on a wage. It's based on a freight rate based solely on the amount of product that he's carrying, and that is a contract that is entered into essentially on a day-to-day basis. The district court properly referred to Chasson versus Louisiana Rock that said that these types of series of daily contracts is more of an independent contractor situation than an employee situation. Secondly, under Hickman, the second and third parts of the Hickman test, they really sort of fall together. The work was independent in nature, and it's piecework. It's piecework because Mr. Jenkins is only doing one thing. He's hauling. He's hauling sand. He's not doing anything general for heck. He is hauling sand or other material, and he is choosing the route to take. He's choosing when to go to work. He's choosing when to drop it off. He's choosing whether to accept work or not accept work. And similarly, if heck didn't need anything hauled that day, there was nothing to haul, then Mr. Jenkins had nothing to do. He would not be paid. It is not indicative of an employee-employer relationship. It is indicative of an independent contractor. Did he ever commit for more than one load? If he started work one morning, was he ever committing more than just that one load, or was he committing for the day? He was committing only for the first load that he took because he never had to contact heck at all to tell heck whether he was going to show up that day. If he shows up, he gets the first load. There's nothing in the record that suggests he's committing for the whole day to keep curing for that day. That's absolutely correct. He would commit to that particular load to drop it off. If he decided he wanted to go fishing, if his truck broke down, he decided he wanted to go to Long Lunch, wanted to take his wife out in the afternoon, whatever he might do, he was not committing to anything more than that particular load that he started, that he picked up, and dropped off and was paid for based on a freight rate. As far as Newcomb, I would suggest that the more recent Tate case that Judge Barbier cited, which is a post-966 amendment case, which the facts line up very well with our case, somebody hauling for dirt construction with a very similar fact pattern that we have here that is more online with this case than the older Newcomb case, which is a pre-966 case. I think with the last bit of my time, I would address the exclusivity issue. In this case, much was made of the fact that Jenkins unilaterally decided only to haul for heck during the year prior. That was a unilateral decision made on his part. He was free to haul for whomever he wanted at whoever was paying the best rate. The Tate case, actually, the driver had hauled exclusively for dirt for seven years, and the court found that that was of no consequence to the fact that he was an independent contractor versus an employee. As far as overall control, Heck did not control the manner and method of which Mr. Jenkins did his job. We outlined in our brief and in Judge Barbier's opinion, the other factors regarding taxes, maintenance, and those things. For those reasons, we would ask that the district court's determination of independent contractor status be affirmed and summary judgment affirmed and Heck dismissed. Thank you, Mr. Blunkett. Mr. Strauss. Good afternoon. May it please the court. I'm David Strauss, and I represent Progressive today. And the issue that you'll decide for Progressive is one of insurance coverage. Progressive policy that issued in this case issued in a way that reflects reality of the industry. So it's helpful to talk about that to understand why the policy did not cancel. In the industry, like Mr. Jenkins, someone who owns a rig, it's not uncommon to switch between two scenarios that require two different kinds of insurance. Scenario one, you're driving for someone else to provide you with insurance. Often you're using their trailer. Scenario two, you're required by the person you're hauling for to carry your own insurance. Drivers often switch back and forth between these two situations. So the Progressive commercial auto policy issues with a non-trucking liability endorsement as part of the policy. For that reason, if an insurer such as Mr. Jenkins wants to change from full trucking liability to non-trucking liability, all that's required is a phone call, which is what Mr. Jenkins did. Mr. Jenkins activated an endorsement that came with the policy that was provided to him. He activated a non-trucking liability endorsement. When he made that phone call and the policy was changed and that endorsement was activated, the policy continued on. It had the same policy period. It insured the same truck. It had the same comp and collision coverage, and it had the same policy number. Nothing new issued to Mr. Jenkins. The policy continued as it was. These insurance products function this way because of how the industry works. The Louisiana legislature has the answer to the question that you asked, Your Honor, about whether this is a cancellation. It also has a law that reflects the reality of the industry, which counsel mentioned, 22-1267. It specifically says that a commercial auto policy cancels upon termination of the policy before the expiration date. Those are the words. The progressive policy did not terminate. One piece of the coverage changed that was specifically requested by Mr. Jenkins, and in response to that, his premium went down $17,000. That policy period continued through July 2018, and then it renewed as a non-trucking liability policy in July 2018, and the accident happened in October. So he made a change, the policy period continued, and then a new policy period started with the same coverage. So to answer your question, it's not a cancellation. And even if it was, 1267 says that the only person who has to get notice of a policy cancellation is, quote, the first named insured. Mr. Jenkins, heck, as an additional insured, under the law of Louisiana has absolutely no right to get notice of a policy cancellation, and it makes sense because, heck, doesn't pay progressive a penny in premium. And 1267 is also important because it says where an insured like Mr. Jenkins requests a change in the policy, no notice, no notice of any kind is required when an insured requests a change in insurance policy, which is exactly what happened in this case. And despite the fact that the policy didn't cancel, and despite the fact that progressive had no obligation to notify Heck that Mr. Jenkins decided to change his coverage, Heck received notice. In January 2018, 10 months before this accident, Heck called progressive and asked for a certificate of insurance, and that phone call was recorded and presented in evidence, and it's before this court in the record. And in that phone call, Heck says, can you send us your certificate of insurance? And progressive says, I'm going to fax it to you right now. And on the phone, in the call, Heck says, I got it. There it is. I've received it. And in that certificate of insurance, progressive clearly and unambiguously says it's a non-trucking policy and that the mate trailer is no longer covered by the policy. Heck had 10 months to do something about that notice if they were concerned about the coverage that Mr. Jenkins had. And they did nothing. So the policy didn't cancel. There was no notice required, and it is clear as day in the phone call from Mr. Jenkins to progressive what he wanted to do. He is engaged in the business of hauling sand and grout. That's what he does. He's a sophisticated insured. And he called progressive and said, I want bobtail. Bobtail means something that's very specific. It means I want to be covered when I'm not under dispatch from somebody else and I'm not hauling their trailer. And progressive explains they call it non-trucking. And then progressive goes on to explain very specifically to Mr. Jenkins that when you are under dispatch and you are hauling, you are not covered by this policy. You have your million dollars when you're using it for personal use. That is what that phone call reflects. And I respectfully disagree with counsel's interpretation of it because that's not at all what the phone call says occurred during that conversation between progressive and Mr. Jenkins. To address the illusory argument, that has no bearing here because the law that addresses this notion of an illusory insurance agreement only applies where an insured pays a premium for coverage that they did not receive. Peck paid no premium to progressive. Peck has no argument for illusory coverage. Mr. Jenkins received exactly the coverage he asked for and he received a premium for exactly the coverage that he wanted. The reality is Mr. Jenkins' drive around his policy had a wreck. His premium tripled to $30,000 and right after that he called progressive and said, I need to change to non-trucking. And the fact that Mr. Jenkins may have misrepresented what he was really doing or the fact that Mr. Jenkins' situation may have changed when he was driving when this accident happened has nothing to do with progressive's duties. Progressive's obligation under the law is to give Mr. Jenkins the coverage he asked for and charge the premium associated with it and that's exactly what progressive did in this case. Thank you. Thank you, Mr. Strauss. Mr. Bourgeois. Yeah. Your Honor, it's Travis Bourgeois on behalf of the Gray Insurance Company in its position as appellee in this case. I'm going to be as brief as possible. I know it's been a long hearing. The only party in this lawsuit to file a claim against Gray was B.J. Trucking. B.J. argued that it was a putative insured under the policy that Gray issued to Heck. Gray filed a motion for summary judgment contending that position was wrong and that summary judgment was granted. We would like the court to affirm that ruling granting summary judgment to Gray. B.J. Trucking, the only party who filed the claim and as to whom the summary judgment was directed, did not appeal. They are not a party to this appeal as an appellant. The only party to appeal was plaintiffs in consolidated cases Hershey and Nagra. Hershey and Nagra asserted no direct claims against the Gray Insurance Company. So Gray takes the position that Hershey and Nagra as appellants have no standing to appeal the ruling as to Gray. They never asserted any claim against Gray. They never filed any pleadings in opposition to Gray's motion for summary judgment. This court held in the Stockstill case, cited in our brief, that a party who has not filed a claim against a party has no standing to appeal their dismissal. And we also, this court cited to Moore's federal practice for that, and we cited to a Third Circuit case, residences at Bay Point, essentially holding the same, that a party who hasn't asserted a claim has no standing to appeal. Our second argument is that appellants Hershey and Nagra did not raise any objection in the trial court unless they have waived the issues on appeal. They did not file memoranda in opposition to Gray's motion. They didn't preserve any argument in the trial court, and therefore the issue is waived on appeal. We cite the court to Hensley and McDaniel out of this court, that having failed to raise an issue in the trial court, a party should not be heard on appeal. Finally, Hershey and Nagra did not brief with specificity any error as to the granting of summary judgment as to Gray in their appellant brief. The failure to brief an issue also waives the claim. So there's no standing, they waive the issues by not filing in opposition, and they waive the issues by not briefing. As to the merits, the ruling is correct. Counsel for Heck just went through the test as to the independent contractor employer status, and that's important as to Gray because the Gray policy issued to Heck will only cover Heck's employees or Heck's trucks or trucks that Heck borrowed. Now, it's undisputed that the truck is Jenkins' truck, and Heck did not borrow it or lease it or use it, so that provision's out. And the trial court clearly found that Mr. Jenkins is not an employee of Heck. I won't go through the argument again, but I'll refer you to the record at pages 5, 7, 5, 9 through 67 where the trial court made multiple factual findings that Jenkins is an independent contractor and that used the tests employed. Judge Barbier used the tests employed in Louisiana. He noted that the burden is on the parties seeking to establish the employer relationship, and they didn't meet that. Heck has an oral contract, not a written contract, but an oral contract with Mr. Jenkins. Jenkins completed work according to his own methods. He was paid for deliveries at the going freight rate, citing to the Chasson case in Louisiana where a person hired each day for a specific assignment or agreed-upon price is indicative of an independent contract relationship. Jenkins was not required to inform Heck if he was unable to make deliveries. He wasn't required to call at all. The relationship was not terminated between Heck and Mr. Jenkins if Jenkins did not call, if he was unavailable, or if he didn't work. They just moved on to the next time he would call, and Judge Barbier cited to Tate. This type of flexibility is the essence of an independent contractor status, not an employee-employee relationship. Heck did not withhold taxes. Jenkins owned, insured, and maintained his own truck. And most importantly, and the thing I wanted to point out in conclusion, is that Jenkins formed a corporation here, BJ Trucking, which is an LLC. So that corporation is not an employee of Heck. The indication of surrounding yourself with the protection of a corporation is more indicative of an independent contractor status between that company and another country, not an employer-employee relationship. With that, I'll see you the rest of my time. Thank you, Your Honors. All right, thank you. You're welcome. Court of Bailiff is open. Thank you again, Your Honors. Just a few points of rebuttal. Against the railroad, my opponent talked a lot about Bobby Jenkins stopping at this crossing, and had he stopped, the accident would never have occurred. Well, there's evidence in the record from the railroad expert, Brandon Ogden, who looked at the totality of the evidence in the case. It talked about other things  which would have been gates and lights at that crossing, to have the cross buck reflectorized, to have a stop sign. Judge Southwick, you asked several great questions about the notice that they had. There's several collisions at this crossing. The railroad doesn't get a pass, and we're not suggesting that in FELA cases, there's not a standard where they can be let out of a case, but there's multiple causes to this accident, and there's evidence in the record that this should be weighed by the jury. There's a 90... It does seem to be key to a huge part of the liability potential against the railroad. It seems to me all they knew is that people don't stop at that crossing, but there's not a visibility problem. Certainly for the poor fellow who was killed in this case, there wasn't a lack of notice problem, but people, for whatever reason, don't stop. Why does the railroad have to adjust because others are ignoring what's there? I mean, what creates that duty? That's a great question, Your Honor, and I would say that the work, Ms. Negra and for Ms. Hershey, the Federal Employees Liability Act creates that duty. They have a duty to provide a safe place to work, and so when they have noticed that they are putting their employees at danger through a crossing that has a history of motorists, for whatever reason, not being able to traverse it safely, they have a duty to take steps with the railroad that owns the track to make sure that it's protected for their employees. It's a different standard. If you're correct, would that be a duty only to the client that was working on the railroad, or would it be a duty to the fellow who doesn't stop? I'm not saying that it affects what they should do, but who gets the benefit of what you just said? Well, the benefit is to, I think, both parties, but it's to the employee, Your Honor. That's why this law, why these railroaders don't have workers' compensation. They have this federal law that protects them. The standard is really... Does it change anything... Yes, Your Honor. ...to note that this was a private road, not a public road? No, Your Honor. The duty, it stands. Under FELA, they still have to provide a safe place to work. It doesn't matter either way. With Canadian National, any negligence on their part is also imputed to Amtrak as an agent of Amtrak, and so their knowledge is key in this case, the knowledge of prior accidents, the knowledge that they have an engineer that has gone through there for 17 years and has reported on numerous occasions near misses at that crossing. That's why we go back in time to look at the history to see what it is that the railroad knew or should have known and how they protect their employees. The Alfaro case that my opponent cited, that was not a FELA case. That's why, in that case, the court looked at the motorist and determined that that was the sole cause. But there's a different standard for Ms. Negra and Ms. Hershey. And I'm out of time, Your Honors. All right, thank you, Ms. Oden. Thank you. Ms. Wyatt for rebuttal. Thank you, Your Honors. May it please the Court. Much of what you heard from my friend, Mr. Strauss, on behalf of Progressive, as to why Bobby Jenkins asked to take the trailer off the policy about increases or decreases in premium, those would be perfectly permissible inferences for a jury to draw. But it's not appropriate to support a motion for summary judgment. And Judge Southwick, you asked me a good question and a rather difficult question to answer in vacuo, which was, well, would any change in the policy be a termination? And the policy was changed from 2016 to 2017. If you'll notice on Exhibit 1, which I handed out, there were two drivers on the policy initially. There was Bobby Jenkins and Elton Robillard. Elton Robillard was removed from the policy before 2018. That didn't terminate that commercial liability coverage. But it was a change in the policy. Likewise, Progressive could have taken that May trailer off of that policy without terminating the commercial liability policy. It didn't do that. What it did instead was sell Bobby Jenkins a non-truck policy. And let's be clear what kind of truck driving would be an uninsured, became an uninsured operation of that truck after it became a non-truck policy. Driving from the home to the job site, well, that was excluded by the Louisiana First Circuit in a 2019 case called George v. Swalwells. Driving from an oil change was held to be a commercial use by this court in Empire Fire v. Marine Insurance v. Brantley. That's 220 Fed 3679. Driving to a motel to stay for the evening after dropping off a trailer to be unloaded. This court held that that was a commercial use in Mahaffey v. General Security Insurance, 543 Fed 3738. And then driving a truck to get it serviced was a commercial use according to the Eastern District of Louisiana in Richardson v. Zurich. So all those uses of the truck which would have been covered under that commercial liability policy, they're no longer covered. That to me sounds like a termination of that commercial liability policy. And Progress' motion for summary was granted based on the district court's conclusion that on August 17, 2017, Progress' agreement to provide commercial truck coverage was terminated. So we're here because that commercial truck liability policy was terminated. As far as what Bobby Jenkins understood, I urge the court to listen to that recording. It's very clear that he didn't understand what non-trucking was and Progress' admitted in its corporate deposition that when they tried to explain why there was no insurance to his widow, that the term non-trucking, they admitted this, was insurance fee. And it had to be explained to his widow by anecdotal examples of the kind of things that would not be covered. When I asked Progress' whether the same kind of explanation was given to Bobby Jenkins before he decided to change his policy, the answer was nobody's going to just tell him that. And that's true if you listen to that recording. Nobody really told Mr. Jenkins what it was he was buying. He was assured that he still had the million dollars coverage on the truck. He was concerned about that. He asked more than once, and I still got the million dollar coverage on the truck. And he was assured that he did. And finally, with regard to the actual exclusion, that exclusion was sent to Mr. Jenkins in a booklet that was over 50 pages. It had a lot of endorsements in it. Some of them didn't even apply to the policy. It was not sent a copy of the exclusion after he activated it by that phone call. And I don't think that passes Monster on to Louisiana law. I don't think he made a knowing change to that policy. And I thank you, Your Honors, and if there are no questions, that's all we have to say today. Thank you. Thank you, Ms. White. Your case and all of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow.